I'm Colin Feynman, and I represent Appellant Thomas Kriesel, Your Honors. I'd like to save three minutes for rebuttal. In prior cases in which the Court has reviewed the DNA Act, the government has reassured this Court about the potential privacy implications of the CODIS program by emphasizing the fact that CODIS, the profile itself, consists of a numeric number, and only junk DNA is involved in the collection and analysis process. What the government now is seeking is an exponential expansion of that program by claiming the right to retain the excess blood samples that contain Mr. Kriesel's full panoply of genetic material. Now there are four main reasons why the government... No, Mr. Kriesel is not claiming that analysis has been done, but certainly the government has claimed the right to do that, most particularly in terms of the right to use the genetic sample for research purposes, which the District Court, in fact, expressly found would be unlawful under the DNA Act. Before we get to that, Mr. Feynman, would you help me with the standing issue here? As you're well aware, under Lujan, you've got to show, in order to show an injury, in fact, a concrete and particularized and actual or imminent, not conjectural or hypothetical, harm. And under Oregon State Police Officers v. Peterson, we found that we cannot assume, as a matter of course, that in this case Oregon units of government will violate the law. As I understand it, your client is claiming that the government, in quotes, could mine his blood sample, and yet, so far as I know, there's nothing in the record that indicates that they ever have mined blood samples beyond the normal DNA extraction. And were they to do so, it would be a criminal violation. Do I misunderstand the evidence that you have put forward to the effect that there really is no evidence that the government has violated or is going to violate its rules about mining your client's six drops of blood for further genetic information? We're not claiming that they have done that, but there are two main points in response to one. One is that the government has, in fact, already violated the DNA Act in collecting the non-FTA samples. And what do you cite for that? Well, the statute itself, the DNA Act, says that a sample may be taken solely for the purpose of creating a DNA profile. But do you have any evidence that it has ever been done? No, no, I'm not suggesting that they've analyzed a non-FTA sample. I'm saying the very collection of excess samples is a violation of the Act. They have to take a sample. A sample, correct. Yeah. And they haven't taken two or three samples. They've taken multiple samples, including half of those samples, which are never used for the purpose, by their own concession. They're never used for analyzing. Well, just to clear up the standing issue, is your argument on standing that they've violated by the use of it or that you're entitled to the property, that it's your property and you're entitled to it back? That's correct. That's the second main point, Your Honor, which I wanted to get to. Under this Court's analysis, for example, in comprehensive drug testing, the very act of retaining private property, including especially something as sensitive as in the comprehensive drug testing case, a urine sample, which could be analyzed, could be analyzed, there was no claim that it had been. I was actually on that panel and joined Chief Judge Kaczynski's point, but that's a very different situation. Your client was involved in a criminal conviction. He was involved later on in a probation and supervision. In the other case, you've got baseball players who confidentially gave their information with the understanding it would never be revealed, and somebody went in and misused the process. That's a very different situation than what you've got here, isn't it? No, I beg to differ, Your Honor. Okay. Tell me why. The reason why is because to the extent that Mr. Creasle's privacy interests were diminished by virtue of his prior conviction, that is addressed, and the government's interests are addressed by the retention of his CODIS profile, and we're not seeking the return of the profile. The district court found more than that, if I recall correctly. I think the district court found that in order to be able to verify the DNA sample, something were to have happened with it, that that was an appropriate retention under the law and that the privacy interests compared to that were minimal. Did I misunderstand that? With all due respect, I think you did, Your Honor. Okay. The district court very expressly found that the quality control reasons that were put forth by the government were not legitimate reasons. No, I don't mean the quality control. What I'm looking at, let me get this out. The match confirmations? What I'm considering is trying to keep the merits separate from the standing. Yes, Your Honor. And we keep going into the merits of who should win. Well, Your Honor, what I want to say is from the standing. But can we just get over standing quickly because I know Judge Smith is concerned about standing. Here's what the district court said. Here, Crasell puts forth an extremely speculative claim for the return of property with no economic value and the return of his property would upset a law enforcement system authorized by Congress. And he previously says, hold on a second here, the need for a backup to CODIS is legitimate. And therefore, the government is entitled to the retention of Crasell's non-FTA section. Now, I agree. He dismissed all the other things that the government had put up on the wall and appropriately so. But he says the backup to CODIS is legitimate. What's wrong with the district court's analysis on that point? That, I think, goes more to the merits. Well, again, I realize there's a little bit of an overflow here. But what I'm asking it for is because I don't see how you get past Lujan where there's no evidence of violation unless you can show to some degree getting into the merits that there is no basis for retaining this. If it's purely bogus, then you don't maybe have the standing issue. Well, Your Honor, no. In terms of standing, the narrow question is does he have a proprietary interest in his genetic material? I think the answer unequivocally is that. Once you have a claim that something that you have a proprietary interest is being unlawfully retained, I believe you have an injury in fact, and that establishes standing. And in what way is he harmed other than the privacy interest where you say there is no evidence of the privacy interest having been violated? Because in comprehensive drug testing, the court very clearly said that you do not need an actual violation of privacy. The mere fact that somebody is retaining your private information against your will without your consent and the possibility of a privacy invasion is sufficient, particularly under Rule 41, which was the narrow question addressing to have standing to bring the claim. Now, in terms of the merits, Your Honor, the problem with the district court's finding was that its conclusion was completely disjoined from its factual findings. The core of what the government has argued here, because it has no statutory regulatory authority to retain the excess samples, is that somehow this match confirmation process gives it a legitimate need to retain the samples or a compelling need to retain the samples. And that is simply not true for a variety of reasons. First of all, this process is not mandatory, as the government has claimed. We have one state at least, Wisconsin, that by law destroys all the excess samples and meets all the auditing requirements for the CODIS program. We also now know that the federal government uses partial matches without match confirmations at all to identify suspects. And, of course, CODIS' purpose is merely investigatory. On top of that, Your Honor, the government has conceded that it routinely collects new samples from the targets and, in fact, as addressed in my reply brief, the only way to actually do a match confirmation is with a new sample. In fact, the idea of a match confirmation based on the excess samples is really a misnomer. The main problems that could arise in terms of the lab procedures are mislabeling or contamination and simply comparing the excess samples to what's on the card, excuse me, on the profile, will not identify the potential error. So the core problem with the government's argument, Your Honor, if they were able to show, either on a factual basis or based upon some congressional authorization, that they had a legitimate need to retain these excess samples, my position would be more difficult. There's no question about that. So your point is the district court's just flat out wrong that there is a need to have a backup to CODIS. Well, remember what the district court specifically found. The district court stated, I believe at ER 46, that even if Mr. Creasel's samples returned, and remember we're talking about Mr. Creasel's sample, the specific sample, it would have no impact on the reliability or the accuracy of the system. As I recall, he did talk about how reliable the CODIS sample is, but I think he also talked about how if for some reason Mr. Creasel or somebody else challenged the reliability of the sample by having the blood drops, they can retest to reconfirm that.  I believe you did, Your Honor. If you look at ER 47, what the judge was looking for, what the judge below said, was that the government is entitled to make this system as accurate as humanly possible. And at the same time stated, but even if Mr. Creasel's samples were returned, and I'm quoting, the system will still be highly reliable and trustworthy. Now, the main problem here is that it's not. Let me just throw out a hypothetical. Yes, Your Honor. Let's assume for a moment that Mr. Creasel's sample got lost in CODIS. They can't find it, but there is a DNA sample at a crime scene that they think might have involved your client. Again, I'm not suggesting he would do any such thing, but they find this. And they go to CODIS and they say, well, where is Mr. Creasel? And they say, we can't find him. In that case, if they took the six drops of blood, I guess three in one place, three in another, re-sampled it, they could check that out. Is that an accurate statement? It may be accurate, but it's also pointless because what the investigation is based upon, what the target is based upon is the numeric profile, which we're not seeking returned. I'm sure there are multiple backups for that number. Okay. Now, if they can't find Mr. Creasel as the target, okay, then there's no point to their investigation anyway because they're looking for an investigative lead. And once they do find Mr. Creasel as a suspect, which is the whole point of doing the initial profiling, then they're going to take a new sample anyway. And they're going to use that new sample to confirm against the initial crime scene evidence whether he, in fact, is a suspect. And from your perspective, in order to take the new sample, they would have to get a search warrant? Either consent or a search warrant, and the district court found below that given the extraordinary liability of the system, they would have no problem establishing probable cause. And, in fact, that is the only purpose of the CODIS system. Remember, the system is not designed to generate forensic evidence. The FBI itself in order to – ID. It's merely for investigative leads. So it's a very limited purpose to establish probable cause with an extraordinarily high 100 percent level of accuracy in terms of the numeric profiles generating correct responses. So when you have that as the entire context in which the government is asking to retain my client's genetic material, I think they are very hard-pressed to show a legitimate need to do that. They have relied on what they call these – what they call mandatory protocols. It turns out they're not mandatory at all because we know that there is, for at least one State, that in the interest of privacy requires the destruction of the excess samples. But which State is that? That is Wisconsin, Your Honor, and the statutory provisions are cited. What about swabs? Are swabs used ever? Your Honor, I think since the time Mr. Creasel's sample was taken, they've switched from blood samples to swabs, but I'm not clear on that in terms of the initial collection. But they're still using – you know, the manner in which the genetic material is collected I don't think is significant. It's the fact that once the analysis is done, the profile is extracted, this genetic library, a stockpile of genetic material is being retained by the government, even though Congress very clearly indicated when it enacted the DNA Act and in the House reports that I cited that it was relying on the fact that only junk DNA, which is somewhat debatable in terms of its privacy implications, but surely is much more limited in terms of the information that's disclosed. Congress relied on the fact that only junk DNA was being analyzed and that the only purpose to which the government could use that junk DNA was to create the numeric profile. Had Mr. Creasel's sample been taken from a buckled swab, would you be entitled or would he be entitled to get back the Q-tip or whatever the instrument was that took the sample because there was still something left on it? Yes, Your Honor. Yes. I don't think the medium makes a difference. It's a consistent principle from your perspective. Yes, Your Honor. Once that profile is generated and even conceding, let's say, that this limited quality control procedure that they do use, which is to go back and re-sample 1% of the swabs or blood samples that came in within the preceding six months, let's say that's even a legitimate quality control method. I'm not conceding that. We are well past the point where there is any quality control purpose that the government can legitimately cite to the court for retaining this excess genetic material. And by doing it, by doing what the government has done here, I submit it has defeated what Congress has assumed and placed in the act in terms of the privacy limitations that would protect people like Mr. Creasel from having the concerns that they do. Well, if they did what you're afraid of, they'd be violating the law. Sure. But after the fact, criminal penalties are really not much of a reassurance, particularly since they've already asserted a position that they can use the samples in defiance of the DNA Act. I'm sorry, Your Honor. I didn't mean to cut you off. I'm sorry. Thank you. Why don't we go step-by-step next time? That won't be so bad, either. Step-by-step, Your Honor? Yes. We expand the power step-by-step. So if they use it for other purposes, that will be all right, too. Well, I don't know if that would be the case. Yes. But certainly if they had gone to Congress and told them that they were doing this, we certainly would at least have had a lot more discussion at that level. Thank you, Judge. We'd better stop you since you're eight seconds over, and we'll give you two minutes for rebuttal. Good morning, and may it please the Court. My name is Jonathan Ellis, and I'm here on behalf of the United States. Your opponent started by saying every time you've come to this Court, you've requested authority to collect the DNA on the basis that you're only going to use junk DNA. Is that incorrect? That's correct. The government is only – I say here this is an expansion of the program. This is simply the administration's approach. It is an expansion of the program, or it is not? No, Your Honor. This is not an expansion of the program. And we're not asking for any further permission except to analyze the sample. But is it incorrect or correct that you've always told the Court that you were doing this, it was all right because you're only using junk DNA? I believe that's correct. The DNA samples, the blood samples in the FBI's possession are only used, analyzed for the junk DNA. But that's all you were putting in the CODIS program was junk DNA. That's all that's being analyzed. That's all that's being discovered. And that's what you told the Court. It was fine because you were only going to use junk DNA in the CODIS program. And that's still true, Your Honor. Yes, for the CODIS program. But this is not just junk DNA on these two cards. That's regular, full DNA. Absolutely. His full DNA is contained in nearly every cell in his body, and it's contained in the blood sample that the government is taking. But when you told the Court all you were using was the junk DNA, that's now changing. This time you want to use the cards that have full DNA. Well, in order to discover the junk DNA, in order to create the profile, we had to take a blood sample. And any blood sample we take… I understand. And then when you put it in the CODIS, then you would use the junk DNA. Yes, Your Honor. That's what's in the CODIS. You took it from a blood sample which had full DNA. Yes, Your Honor. When you check to see whether it's the same person, as I understand it, that's what you do. You check the real sample against the card. Yes. And you're still checking only – are you checking any more than junk DNA, or are you checking just the junk DNA on the real sample? Just the junk DNA. You're retaining the full DNA. Retaining the blood. Yes, Your Honor. So to analyze the blood for anything further than the junk DNA, it's criminally prohibited. Now, I didn't ask you that, did I? I said when you asked for the right to use this CODIS program and to put DNA in it, you said don't worry about it, don't worry about the privacy interest, because all we're putting in is the junk DNA. Yes, Your Honor. Let me follow up on Judge Reinhart's question. If it were possible, and I should add parenthetically, I understand that in every cell in the body you've got the full DNA sample, and in the blood you've got gazillions of DNA molecules or whatever their subset is. If it were possible, I don't know that it is, but if it were possible to extract from these six drops of blood all of the junk DNA and all that you had left was everything else, would the government object to the disposal, or rather in this case the return, to Mr. Kreisel of all the rest of the blood except what was necessary to show the junk DNA? No, Your Honor, it would not. The only thing that we need this blood for is to analyze the junk DNA from the blood sample. Why don't you just take the junk DNA, you do that for the CODIS. Why don't you put just junk DNA on these cards? That's just not technologically possible. We can only have the blood sample on the cards, and we can analyze that only for the junk DNA, but technology isn't such that we could extract the physical, tangible junk DNA. The concern was, in the other cases, that everything about the person was being turned over to the government. You could find out everything about them, and the government said, oh no, because we're only using junk DNA. Now you're saying we want to retain the DNA that tells us everything about the individual. But they're also saying, I believe, that all they're going to take from that is the junk DNA, and it's physically, technically impossible now to extract the two. Is that correct? That's correct. Yes, and to be clear with the... No, but that's not the point. I'm saying when you got this court to agree that you could use the CODIS program, and you can read every one of our decisions to say, well, you don't have to worry about the privacy interest, because all the government's keeping is the junk DNA. And now that's not true, is it? I believe even what Kreisel 2 said, or excuse me, Kreisel 1 says, is that the privacy interest he's asserted here, he asserted there, and that they are legitimate, but they are mitigated by the criminal prohibitions from analyzing anything further than the junk DNA, and that is still true. It is still criminally prohibited. It's not technically feasible to extract only the junk DNA or keep tangibly only the junk DNA. Let me ask you about the needs of this. You've had about 125,000 cases? At the time of the district court's decision, it was about 125. And there has never been a case where the CODIS was wrong? Well, I can't speak authoritatively to the practice in all the states. I can speak to the FBI. What about the CODIS? Well, CODIS has participants, the state labs, local labs, and federal FBI labs participate in the CODIS program. I'm unaware of any error, but I can't speak authoritatively to the state practices. I can to the FBI's practices. So the CODIS program has worked 100% for the federal program? To my knowledge, there has not been an error in the 125 or 160 now without matches. Now, there are over 10 million profiles in the database, and the quality assurance procedures, the ones that he said don't apply to Kreisel's blood sample, only test 1%. And then the 160,000 tests right before the investigation. Are you aware of any case in which the matching program served a purpose? I think it does serve a purpose, but, no, I'm not aware of a case where it's caught an error. As I said, at the time of the district court's opinion, there was about 8 million profiles. There are now 10 million. And as these continue to be added to the system and searches are run, the potential for an error is there, and the government's retention of the- And what would happen if after these millions of tests, where you never needed this matching program because it never caught anything, if it did catch something, what would happen? All you do with the CODIS program is you say to the local police, here, test, take a blood sample and see if this is a person. Sure. And you've never had to do, never made a mistake, never done any harm. And if you did any harm, the harm you would do would be that you would be taking one person's blood sample and it turned out it wasn't the person. That would be the injury? Well, there would be other costs, of course. First, if I could explain exactly what would happen. Under INDIS procedures, if the match confirmation process did not end in a confirmation of the match, the identity of the perpetrator would not be released to the investigators. But I said if there were no program and, therefore, you did release the identity to the investigators. Right. What would happen? Well, the costs at that point are to, first, Mr. Creasle, also to the law enforcement resources, the judicial resources. So we would have to then go out and find Mr. Creasle, of course, and draw a new sample. That's going to take some time. We also have to obtain a search warrant for that process. Yeah. And none of this has ever happened. This is all entirely speculative because as long as you've had the CODIS program, there's never been a problem. That's correct. There's never been a problem. The match is not found in error, nor is there any evidence in the record that the privacy interest that Mr. Creasle is asserting has ever come to pass. The question here is whether or not our retention is reasonable. And because of the cost that an error would run, we think it's reasonable to keep it and make sure that an error does not occur. It's reasonable to take all of the information about an individual, turn it over to the government, because you might someday have one case in which you took a blood sample by mistake when it wasn't necessary. You had the wrong blood sample. With all due respect, Your Honor, I don't think what you can say here is we've collected all the information. Of course, his DNA is in his blood, but we haven't acquired that information, and we're criminally prohibited from doing so. You haven't analyzed it. You don't have it in a data bank. That's correct. But you have the source of the information. Well, we don't even have the equipment to derive it. So, yes, it is, of course, in his blood as it would be in a skin, cells of a sin or in his saliva. Five years from now, you have a government that's not as concerned about individual rights as the present administration. Suppose you have a government that's not sympathetic to the Constitution. You have all of this available, all the information about every citizen. It would still be until Congress acted criminally prohibited. Wait a minute. Are we talking about every citizen here? No, no. No, I said every citizen. That's who's in this space. Oh, is in this space. Ten million people. Okay. The felons. All the information about ten million people that's available and ready for an administration that says, well, we don't care about those privacy rights. Isn't that conceivable there could be such an administration that's not as concerned about privacy? It's a bit of a stretch to say there would be an administration who didn't care about the criminal law, Your Honor. It would be Congress, wouldn't it? It would be Congress that would change the law. That could happen too. We tend to get Congresses that aren't as good as we might like. Absolutely, and in Kincaid and in Haskell, this Court said if that were to occur, if the law were to change, if there was any evidence that these privacy interests had been invaded, then the Court could then step in at that point. And this 41G has no statute of limitations. If the law changes, I think he's got a legitimate, at least a colorable claim. Some of us might be concerned, not others, that there's this process available. Would ten million citizens have all the information in the hands of the government and all you need to do is change the law? Well, others will not be concerned about that. I am aware of that. Can I ask this question? We're talking about 41G. As I'm looking at it now, you've got Mr. Kreisel, who is concerned about the possibility of the government mining his blood samples for additional information. On the other hand, you have a procedure, a backup procedure for CODIS. The government is asserting others, but the district court, I think, appropriately discounted many of those. Both of them are highly speculative. In the case of Mr. Kreisel, there's no evidence they've ever done it, nor are they going to do it. It's prohibited by law. On the other hand, is there any evidence that the government has ever used the blood samples, either of Mr. Kreisel or anybody else, as a backup for CODIS? Well, certainly, yes. On all 160,000 matches that have matched reports that have gone out, the confirmation process has been completed. And for all 4,000 for which the FBI has sent out, that confirmation process includes a reanalysis. Okay, so that's very important then. So what you're saying is that when something goes out, they actually do go through the blood drops and they retest in this case. Is that correct? Absolutely, yes, sir. Okay, that's important. And they've never found that that found anything. But they do test it, though. It's not just a speculation. Okay. And I want to clear up something. Well, let me go back to what Ted Smith asked, because he's right. He said it's all speculative, that you might misuse the process, and it's speculative that your process might catch anything. It's speculative on both sides. You've got a process that may someday find an error but never has. They say, well, you're keeping our blood, and you might misuse it. But the question isn't whether you would misuse it. The question is, are you maintaining, are you keeping their property without sufficient reason? And whether you'd misuse it or not, if they return their property, this is a motion to return property you have no sufficient cause for. And to say it's speculative that maybe someday you would have a reason and it's speculative that you'd misuse it seems to me to make their case. The burden is on you to show that you have a reason to retain their property after the reason you originally took it for has been satisfied. You put it into your CODIS. Now you want to use it because maybe someday it will prove useful to you, although it never has as long as you've had it. I think first, Your Honor, the blood was collected in order to maintain his profile in CODIS, and it's still being used for that purpose. I don't think the burden has shifted here. Second, as far as legitimate reasons and use, as I answered to Judge Smith, it is being used. Now, whether or not it hasn't caught an error yet, but it's a reasonable judgment by what was invested first or gave first to the Director of the FBI to keep it in order to insure against that error and to insure against the cost. Where in the record does it indicate that this backup has actually been used to test the accuracy of the CODIS? Well, I think if you look at the affidavit from the Director. Do you know what the ER is on that or SER? Just a moment. It's in the ER. It starts at ER 5. Okay. And then if you'll flip. The match report, the discussion begins on page 10, and it talks about how if before any other offender would be released, the reanalysis would be done. Okay, so then this isn't speculative anymore on this side because those six drops, if Mr. Chrysler is involved, those are actually used. They may not find any error, but they are being used as a proof of the earlier determination, right? Yes, Your Honor. Okay. And I'd like to collect two points if I could. I know I see my time's out. That's all right. Go ahead. You had more than 10 minutes anyway. You had 15. Thank you. That's a really long time for us to give a case. Well, one point. So the government opposing counsel claims that the release, the identity of the offenders is regularly released on a partial match. That's from a quote from the FBI that it's not true. If you look up the question just before that, it says, what is a partial match? And a partial match as defined by the FBI there is an extremely rare circumstance where two profiles that are single sourced are not an exact match but are so close that it could be a family member. This has happened 13 times in the history of CODA, so we're talking about a rare occurrence there. And even there, the reanalysis would be done. The match confirmation process in its whole could not be done because at the end of the match confirmation process, you say this is the guy. You can't say that there. But the reanalysis would be done because it makes no more sense to go to investigate the family members of the wrong offender than it would to investigate the wrong offender himself. Second, Wisconsin actually does retain samples. They've interpreted the statute that is cited by opposing counsel to say that we can't get rid of the samples here because we don't know if analysis is complete. The reason they say that is precisely because of the confirmation match process and because they don't know if they're going to need it for technological advancements. And so that's not a counterexample. Wisconsin does retain the samples. And thirdly, if I could, we haven't claimed anything over our authority here. The research we're talking about is identity research. It would not go beyond junk DNA. And the courts, the D.C. Circuit, the Tenth Circuit, the First Circuit, have all read the Act to authorize that use. If you look at Section 42 U.S.C. 14135E, that's not a subject, but 13135E, subsections A and B, you'll see the authorized uses that reference back to the identity research. And to be clear, that identity research can only be done after CRECEL's personally identifiable information is removed. Yeah, I just want to make sure I understand what you said with respect to Wisconsin. You said Wisconsin does keep the samples, but it doesn't do the testing. Well, no, it does. It does? Yes, Wisconsin does the confirmation match process as it must, and their confirmation match process includes a reanalysis of the stored samples. So that statute says they have to discard the samples when the analysis is complete, but their interpretation of that statute is that they can't say the analysis is complete because they haven't done it. It's a practical matter that that's the way they interpret that. That's correct. So they do not discard the samples. Let me just ask you one question about the difference between the FTA samples and the non-FTA samples. One of them is used to check the CODA report? The FTA sample is used to generate the profile originally and as the first place you'd go to do the confirmation match process. And then what about the non-FTA? That's the other three drops, right? That's right, yes, Your Honor. It's stored and it's used first as a backup to the FTA. Additionally, though, it would be used for the accommodation of any technological advancements. So you couldn't use the FTA sample in order to, say, add additional loci. All junk DNA still, but add additional loci. Okay, now on the non-FTA sample, have they been used to back up the FTA samples, which back up the CODAS? We have not analyzed a non-FTA sample, but the CODAS core working group is currently considering adding additional loci in order to accommodate international standardization of the process as well as to increase the discriminating ability of the DNA system. And non-FTA samples are the only thing that could be used for that process. I don't understand. You mean you use the non-FTA samples to test for possible scientific advances? No, the advances wouldn't be developed there. If I could explain how this, one way this might play out. If the core loci group decided to add additional core loci to the DNA profile, so they have to notify Congress of that six months before doing so, and they would also be a non-coding loci. This is still junk DNA. But if they were to add loci, the reason for doing that, one, for international standardization, but two, because crime scene samples are often degraded, and so you can't measure the entire 13. And if you can't measure 10, the FBI won't ever run a search. And so if you increase the loci, you would increase the possibility that a crime scene sample might get a full array or at least 10 loci. And then in order to match that against Kreisel's sample, you would have to have the non-FTA sample that you could use to measure those additional loci. So those drops are retained in case you change your system? That's right, and as a backup to the original. But they're not used as a backup to the original. They have not been used to this point. So that – Kreisel. Non-FTA samples have not been utilized. Oh, I see, non-FTA, okay. That's right. And so even I think Ted Smith will be satisfied that that's speculative that you'll actually use those. I think that's true, but I don't see Kreisel's request as requesting the return of just the non-FTA sample. That would not address his privacy concerns. That is the basis for his claim here. Well, it would cut it in half. Perhaps. All right. If there are no further questions, I'd ask the district court's order to be affirmed. Thank you. Thank you. Just a few quick points. The government's argument in this case is a perfect example of the mission creep and shifting justifications. The government claimed very clearly below that they could use these samples for research purposes and technological development, and the district court found that that specifically would be an unlawful purpose. And there would be no notice or opportunity for Mr. Kreisel to challenge the use of his samples at that point. There's no notice or requirement that the government let him know if there's being a reanalysis of his samples. Also, what's in the database, Judge Schroeder, is not just felons. It's arrestees, deportees, and it has exponentially expanded since the time that the program was originally approved. So it's not just that Mr. Kreisel might have a diminished privacy interest to some extent. Even though he has fully paid his debt to society, there's larger privacy implications even for people who have not had convictions. Well, he is a convicted felon. Yes, that's true, Your Honor. It would be maybe a different. Correct. Now, Your Honor, also, the government might have a better argument if these match confirmations served some practical purpose, but the court needs to get a little bit into the weeds of the affidavits and what was actually alleged. In the Coleman affidavit at ER 46, it is explained that this process was originally set up when the system was new because they weren't sure exactly how accurate it would be, and it was a redundancy or backup. It is proven to have, according to the Coleman affidavit, minimal, if any, practical value. And more importantly, if we're looking at this either in terms of Rule 41 or a bouncing of interest, there's a reasonable accommodation that the government has for those so-called match confirmations at the lab level. They have conceded that they routinely go out and collect a new sample because it is the only way to actually confirm that the original identification is accurate because of the potential for mislabeling or contamination. Can I ask you one thing? You had indicated earlier that Wisconsin disposes of these samples. Mr. Ellis indicates that despite the authorization of the Wisconsin statute to do so, that, in fact, Wisconsin does not do that, does not dispose of it. Do you dispute that? Well, I have to because there's nothing in the record to support it in the plain reading of the Wisconsin statute, Your Honor, is that the excess samples are supposed to be destroyed once the profile is extracted. Okay. So you're saying that all that's in the record is just the statute, and the statute directs this. He's giving us something extra record. Right. Not only just the record and, to my knowledge, outside the record. The plain reading of the statute is that these excess samples are required to be destroyed once the profile is generated, and, in fact, the Wisconsin lab is routinely accredited by the FBI and the DNA Advisory Board, which I think really creates an inconsistency about how this match confirmation process really serves any practical purpose. Thank you, Your Honors. Thank you, counsel. The case to be argued will be submitted. Next case for argument is...
judges: Schroeder, Reinhardt, Smith